UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

          Plaintiff,

 -vs-                              Case No. 18-CR-114-JDP

THOMAS CALDWELL,               Madison, Wisconsin
                                 September 6, 2018
             Defendant.        11:05 a.m.

---

STENOGRAPHIC TRANSCRIPT OF PLEA HEARING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON
*TRANSCRIBED FROM DIGITAL RECORDING*

APPEARANCES:

For the Plaintiff:

                Office of the United States Attorney
                BY:  TIMOTHY M. O'SHEA
                    CHADWICK M. ELGERSMA
                Assistant United States Attorneys
                222 West Washington Avenue, Suite 700
                Madison, Wisconsin  53703

For the Defendant:

                Federal Defender Services of Wisconsin
                BY:  PETER R. MOYERS
                22 East Mifflin Street, Suite 1000
                Madison, Wisconsin  53703

Also appearing:    THOMAS CALDWELL, Defendant
                LORI BAKER, U.S. Probation Officer
                Special Agent MICHAEL KLEMUNDT, ATF

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

1       (Proceedings called to order at 11:05 a.m.)

2       THE CLERK:  Case No. 18-CR-114-JDP, *United States of*

3  *America v. Thomas Caldwell*, called for an initial appearance and

4  plea hearing.

5     May we have the appearances, please.

6       MR. O'SHEA:  Good morning.  Tim O'Shea for the United

7  States.  With me is Special Assistant U.S. Attorney Chad

8  Elgersma and also Special Agent Michael Klemundt.

9       THE COURT:  Good morning to all of you.

10      MR. MOYERS:  Peter Moyers from Federal Defender

11  Services, and seated here to my left is Mr. Caldwell.

12      THE COURT:  Mr. Caldwell and Mr. Moyers, good morning

13  to you.

14      MR. MOYERS:  Good morning.

15      THE COURT:  All right.  So we're proceeding on the

16  basis of an information, so, Mr. Moyers, have you and Mr.

17  Caldwell received a copy of it?

18      MR. MOYERS:  Yes, we have.

19      THE COURT:  Would you like to have it read?

20      MR. MOYERS:  We would waive reading today.

21      THE COURT:  Okay.  So we're going to get to what the

22  information means in a minute or two, but for now I'm going to

23  ask whoever got the point -- I assume it's Mr. O'Shea -- to

24  tell me what the penalties would be if Mr. Caldwell were --

25  would be convicted.

1    MR. O'SHEA:  So Mr. Caldwell's charged with one

2 count --

3    THE COURT:  I'm going to ask you to pull your

4 microphone --

5    MR. O'SHEA:  Yeah, one count of violating Title 18,

6 United States Code, Section 922(a)(1)(A).  The maximum penalties

7 are five years in prison, a $250,000 fine, a three-year term of

8 supervised release, and a $100 criminal assessment penalty.

9    THE COURT:  All right.  Very good.  And is there

10 restitution involved?  It was cited in the plea agreement.

11    MR. O'SHEA:  Yeah.  We list it in the plea agreement on

12 further research, and that kind of preserves the option.  In my

13 view there are no direct victims or indirect victims that would

14 qualify for restitution, but it is left there as sort of to

15 preserve it as a remote possibility, but, frankly, I don't think

16 anybody qualifies.

17    THE COURT:  All right.  Okay.  Very good.  Okay.

18   All right.  So, Mr. Moyers, have you talked with Mr.

19 Caldwell about the charges against him, the penalties that might

20 result, and whether he has any defenses?

21    MR. MOYERS:  Yes, we've discussed all those things.

22    THE COURT:  Okay.  Mr. Caldwell, my understanding is

23 you want to enter a plea today; is that right?

24    THE DEFENDANT:  Yes, sir.

25    THE COURT:  All right.  So the purpose of our hearing

1    today is to make sure that you're capable of proceeding today,

2    that your plea is truly voluntary, that you understand the

3    charges and the penalties that you might face. I also have to

4    make sure that there's a factual basis for the plea, which means

5    that there's a reason for me to believe that you're actually

6    guilty of the crime, and also I want to review the rights that

7    you'll give up if you plead guilty. So I'm going to have to ask

8    you some questions that you'll have to answer under oath, and so

9    I'm going to ask you to stand up and raise your right hand, and

10   the clerk is going to swear you to tell the truth.

11                **THOMAS CALDWELL, DEFENDANT, SWORN**

12        THE COURT: All right. Very good. Have a seat again.

13   I need to make sure that you understand that now that you've

14   sworn to tell the truth, if you knowingly give any false answers

15   to my questions, you could be prosecuted for perjury. Do you

16   understand that?

17        THE DEFENDANT: I do. Yes, sir.

18        THE COURT: Okay. So my first few questions are to

19   make sure that you're capable of proceeding today and that your

20   decision to plead guilty is really voluntary. So let's begin

21   with this: Tell me how old you are.

22        THE DEFENDANT: 68, sir.

23        THE COURT: Okay. And how much formal education have

24   you had?

25        THE DEFENDANT: High school and college.

1          THE COURT:  High school and college?

2          THE DEFENDANT:  A little bit of college.

3          THE COURT:  And some college.  Okay.  All right.  So

4     you signed a plea agreement that was several pages long.  Do you

5     think you were able to read that and understand it before you

6     signed it?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  All right.  Very good.  So let's find out

9     if there's anything that might interfere with your understanding

10    or your decisionmaking today.  Do you suffer from any physical

11    or mental illness?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  Tell me about that.

14         THE DEFENDANT:  I've been schizophrenic all my life,

15    hearing voices.  The last 20 years the voices stopped on the

16    medication, but it causes diabetes and weight gain and memory

17    loss, but it works.  I have tried several other times -- five

18    times different drugs that don't work so -- I get delusional so

19    back to the original drug.

20         THE COURT:  Okay.  So let me ask you this:  You said

21    that you suffer from schizophrenia, but you've been under

22    medication for about 20 years; is that right?

23         THE DEFENDANT:  About 40 now.

24         THE COURT:  40 years now.  Okay.  Okay.  And so -- and

25    the medication is effective to control the symptoms of your

1    schizophrenia; is that --

2         THE DEFENDANT:  Yes, sir.  It turns off part of my

3    brain.

4         THE COURT:  Okay.  All right.  But the medication has

5    some side effects; is that right?

6         THE DEFENDANT:  Yes, sir.

7         THE COURT:  And if I try to make a couple of quick

8    notes here, that the side effects include diabetes; is that

9    right?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Okay.  And so does the diabetes interfere

12    with your ability to understand what's going on around you or

13    to -- does it interfere with your decisionmaking in any way?

14         THE DEFENDANT:  No, sir, it doesn't.

15         THE COURT:  Okay.  And then I think you also said that

16    the medication causes some memory loss; is that right?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  Okay.  So is that memory loss so

19    significant that it would interfere with your ability to

20    understand what's going on around you or your ability to make

21    good decisions?

22         THE DEFENDANT:  Every day is pretty much a fresh day

23    with me, sir.

24         THE COURT:  Okay.

25         THE DEFENDANT:  I don't remember much of the past, but

1    if I sit down and think about it, if it doesn't come to my head,

2    somebody brings it up, I can usually remember it.

3         THE COURT:  Okay.  Well, let me ask you this:  Do you

4    remember you're charged with a crime here and you're in court

5    here to -- apparently to plead guilty?  Do you remember

6    committing the crime?

7         THE DEFENDANT:  Yes, sir, I do.

8         THE COURT:  Okay.  So that part of your memory is not

9    interfered with.

10         THE DEFENDANT:  Right.

11         THE COURT:  You have a good memory of what you did --

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  -- that led to your being charged?

14         THE DEFENDANT:  Yep.

15         THE COURT:  Okay.  All right.  So -- and let me find

16    out if my notes missed anything.  So other than the memory loss

17    and the diabetes, other side effects of that medication that you

18    take for schizophrenia?

19         THE DEFENDANT:  Not really, sir.

20         THE COURT:  Okay.

21         THE DEFENDANT:  It's been about 20 years I've been on

22    it, and it works.

23         THE COURT:  Okay.  Why don't you tell me what it is.

24         THE DEFENDANT:  Olanzapine or Zyprexa.

25         THE COURT:  Okay.  I'm going to ask you to say those

1    one more time real slow because we don't have a court reporter

2    here, and so the recording has to do for us to get a good record

3    of it, so tell me those meds again.

4            THE DEFENDANT:  Olanzapine.

5            THE COURT:  Okay.

6            THE DEFENDANT:  Or else Zyprexa is the civilian name

7    for it.

8            THE COURT:  Okay.  Same drug, one is probably generic,

9    one is the brand name; is that right?

10           THE DEFENDANT:  Yes, sir.

11           THE COURT:  Okay.  All right.  Okay.  Okay.  And when

12   you're on that medication, do you feel that the symptoms of your

13   schizophrenia are well controlled?

14           THE DEFENDANT:  Yes, sir, they are.

15           THE COURT:  Okay.  All right.  And so let's talk about

16   today.  Do you feel good today?  Do you feel like you can make a

17   good decision?  Do you understand what's going on around you?

18           THE DEFENDANT:  Yes, sir, I do.

19           THE COURT:  Okay.  All right.  Okay.  Let's make sure

20   that we do a full inventory then of your mental illnesses and

21   your physical illnesses.  Any other mental illnesses that you

22   have?

23           THE DEFENDANT:  No, sir, I wouldn't say there is.

24           THE COURT:  Okay.  Let's talk about the physical side

25   of things.  Any physical illnesses that you have?  You mentioned

1    the diabetes already.

2              THE DEFENDANT:  High blood pressure --

3              THE COURT:  Okay.

4              THE DEFENDANT:  -- and cholesterol.

5              THE COURT:  Okay.

6              THE DEFENDANT:  Nothing that really affects my

7    day-to-day life.

8              THE COURT:  Okay.  All right.  And so you take

9    medications for those conditions?

10             THE DEFENDANT:  Yes, sir, I do.

11             THE COURT:  Okay.  Why don't you tell me what those

12   medications are.

13             THE DEFENDANT:  I don't know what they are.

14   Hydrochlorothiazide for the blood pressure.

15             THE COURT:  Okay.

16             THE DEFENDANT:  I don't know what the cholesterol

17   medication is.

18             THE COURT:  Okay.  All right.  Well, let me ask you

19   this:  Do the medications that you take for the high blood

20   pressure or the high cholesterol, do they affect your awareness

21   or your decisionmaking at all?

22             THE DEFENDANT:  No, sir, they don't.

23             THE COURT:  You don't have any mental side effects?

24   They don't make you drowsy or woozy or anything?

25             THE DEFENDANT:  No, sir.

```
 1              THE COURT:  Okay.  All right.  Okay.  So have we
 2    covered all of the physical impairments that you have as well
 3    then?
 4              THE DEFENDANT:  Yes, sir, I think so.
 5              THE COURT:  Okay.
 6              THE DEFENDANT:  I wear glasses, of course, but that's
 7    not an impairment.
 8              THE COURT:  Okay.  So that's -- I certainly hope that
 9    people can wear glasses and still understand what goes on around
10    them.
11              THE DEFENDANT:  My hearing sometimes fades.
12              THE COURT:  Your hearing -- sometimes you have problems
13    with your hearing?
14              THE DEFENDANT:  Yes, sir.
15              THE COURT:  Okay.  Well, let's do this:  Would you make
16    sure if you don't hear anything that I say or that anybody else
17    says, you let me know and we'll repeat it for you, okay?
18              THE DEFENDANT:  Yep.
19              THE COURT:  All right.  Okay.  And have you told me
20    about all the medications that you're taking?
21              THE DEFENDANT:  There's about 20 of them, sir, and --
22              THE COURT:  Well, you haven't listed 20, but tell me --
23    just categorically what are they for?
24              THE DEFENDANT:  Blood pressure; cholesterol; anxiety;
25    schizophrenia; Ranitidine, acid reflux.
```

```
 1              THE COURT:  Okay.

 2              THE DEFENDANT:  Vitamin D deficiency.

 3              THE COURT:  Okay.

 4              THE DEFENDANT:  Gluten and zinc deficiency.

 5              THE COURT:  All right.

 6              THE DEFENDANT:  Levothyroxine for an active thyroid.

 7              THE COURT:  Okay.

 8              THE DEFENDANT:  That's sort of up in the air what

 9     that's doing.

10              THE COURT:  Okay.  All right.  And I hate to be

11     redundant, but, you know, what I really need to make sure is

12     that -- I've got to make sure that you're fully aware of what's

13     going on and that you're making a good decision in deciding to

14     enter a plea to this crime, so I've just got to make sure that

15     you have your wits about you --

16              THE DEFENDANT:  Yes, sir.

17              THE COURT:  -- is what I'm getting at.  So that

18     antianxiety medication, sometimes that has sort of an effect on

19     your mental outlook.  That's why you take it.  But does it make

20     you confused or drowsy, make it hard for you to pay attention or

21     understand what's going on around you?

22              THE DEFENDANT:  If I don't take it, it does, but

23     there's no side effects if I do take it.

24              THE COURT:  Okay.

25              THE DEFENDANT:  Dry mouth and --
```

1         THE COURT:  Okay.

2         THE DEFENDANT:  It stops me from pacing the floor.

3         THE COURT:  Okay.  And so you've taken your antianxiety

4    medication so that -- your anxiety is well controlled at the

5    moment; is that right?

6         THE DEFENDANT:  Yes.

7         THE COURT:  Okay.  All right.  Very good.  Okay.  So

8    you're on a lot of medications, and so I just want to make

9    sure -- I'll ask you one last time -- in summary, none of those

10   medications that you're taking interfere with your ability to

11   understand what's going on around you and your ability to make a

12   good decision about whether to plead guilty to this crime; is

13   that right?

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  Okay.  All right.  Very good.  Okay.  So

16   are you addicted to drugs or alcohol?

17        THE DEFENDANT:  No, sir, I'm not.

18        THE COURT:  Okay.  And are you under the -- other than

19   the drugs, the medication that we talked about, are you under

20   the influence of any drugs or alcohol right now?

21        THE DEFENDANT:  No, sir.

22        THE COURT:  Okay.  Is there any other reason that you

23   might not be able to follow what we're doing today?

24        THE DEFENDANT:  Not really, no, sir.

25        THE COURT:  Okay.  All right.  And you said "not

```
1    really," but I want to make sure that we've got it nailed down
2    really precisely.  Some things that maybe -- sometimes if
3    somebody says "not really," I don't know whether it's just a
4    manner of speaking or whether they really are reserving
5    something.
6             THE DEFENDANT:  Being a mental patient, nobody trusts
7    anything I say or do.
8             THE COURT:  Uh-huh.
9             THE DEFENDANT:  But I just -- I trust myself.
10            THE COURT:  Okay.
11            THE DEFENDANT:  And the police trust me.
12            THE COURT:  Okay.
13            THE DEFENDANT:  But I just don't --
14            THE COURT:  Okay.  I understand that because the
15   diagnosis of schizophrenia is a serious one, but I just need to
16   make sure today for my purposes here that you really understand
17   what you're doing because I don't want you to plead guilty if
18   you -- if you're doing so because you're confused and you don't
19   understand what's going on, so I just need to make sure that
20   you're deciding to plead guilty fully understanding what's going
21   on around you and what the consequences of pleading guilty would
22   be.  So you feel confident that you'd be able to do that today?
23            THE DEFENDANT:  Yes, sir.
24            THE COURT:  All right.  Very good.  All right.  So, Mr.
25   Caldwell, the next area I want to cover is whether you've had
```

1    enough time and you've actually talked with Mr. Moyers about

2    certain topics to make sure that he's advised you because you've

3    got a right to counsel here, and I want to make sure you've

4    taken advantage of that, and so I'm going to ask you about some

5    topics that I want to make sure you discussed with Mr. Moyers.

6    So the first one is have you talked about the nature of the

7    charges you face?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  Do you know what you're being charged with

10   and what the elements of that crime are?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Okay.  And have you talked about the facts

13   the government thinks it could prove if this case went to trial?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  And have you talked about whether you have

16   any defenses to the charges against you?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Okay.  And in the case of somebody with a

19   serious mental illness, have you considered whether your mental

20   illness might afford you with some defense to the criminal

21   charge?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Okay.  And then last thing -- last topic I

24   want to make sure you discussed is the sentencing guidelines.

25   Have you talked about the United States sentencing guidelines

1    and how the sentencing guidelines will affect the sentence

2    you'll receive?

3                THE DEFENDANT:  Yes, sir.

4                THE COURT:  All right.  Good.  Okay.  So tell me in

5    your own words what you think you're being charged with.

6                THE DEFENDANT:  Selling firearms without a license.

7                THE COURT:  Okay.  Selling firearms without a license.

8    Okay.  So you understand if I accept your plea to that charge

9    and adjudge you guilty, you could be subject to the penalties up

10   to the maximum penalties that Mr. O'Shea went over.  Do you

11   understand that?

12               THE DEFENDANT:  Yes, sir.

13               THE COURT:  That means I could sentence you to up to

14   five years in prison.  Do you understand that?

15               THE DEFENDANT:  Yes, sir.

16               THE COURT:  And I could impose a fine of up to

17   $250,000.  Do you understand that?

18               THE DEFENDANT:  Yes, sir.

19               THE COURT:  I will have to impose the mandatory $100

20   criminal assessment penalty.  Do you understand that?

21               THE DEFENDANT:  Yes, sir.

22               THE COURT:  And any period of incarceration that I

23   impose could be followed by a period of supervised release that

24   could be up to three years.  Do you understand that?

25               THE DEFENDANT:  Yes, sir.

1      THE COURT:  Okay.  And that period of supervised

2  release would be subject to certain conditions and restrictions

3  that I would impose on you.  Do you understand that?

4      THE DEFENDANT:  Yes, sir.

5      THE COURT:  And if you violate any of those conditions

6  or restrictions, I could send you back to prison for violating.

7  Do you understand that?

8      THE DEFENDANT:  Yes, sir.

9      THE COURT:  All right.  Okay.  So let's talk about the

10  federal sentencing guidelines.  And so we've got Lori Baker in

11  here, who is, I think, filling in for somebody.  Who is writing

12  the presentence report?

13      AGENT BAKER:  Ms. Cwirla.

14      THE COURT:  Katie Cwirla is the probation officer who

15  will compile the information that I'll use in setting your

16  sentence, and one of the things that that -- that information

17  will be in a report, and one of the things that the report will

18  do will be to calculate the sentencing range that's recommended

19  under the United States sentencing guidelines, so I'm going to

20  talk about some of the factors that will go into the calculation

21  of that guideline range.

22      Okay.  So, first of all, you understand that the starting

23  point will be the offense level that the guidelines assign to

24  the crime that you're thinking about pleading guilty to.  Do you

25  understand that's the starting point?

1            THE DEFENDANT:  Yes, sir.

2            THE COURT:  Okay.  And then other conduct relevant to

3    the crime gets considered, and in a case like this, lots of

4    different things could be considered, but the kind of firearms,

5    how many firearms, things like that that is conduct that is

6    related to the crime charged gets considered under the

7    guidelines.  Do you understand that?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  Okay.  Now, the fact that you've accepted

10   responsibility by pleading guilty, assuming that there's no

11   reason to deny you that credit, that's a factor that counts in

12   your favor under the guidelines.  Do you understand that?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  Okay.  And your role in the offense gets

15   considered, and that usually means two things:  One, if there's

16   more than one person involved in the offense, if you're a

17   leader, it counts against you, and if you are a more minor

18   participant, it might count in your favor.  So that's one aspect

19   of the role in the offense if there's more than one person

20   involved.  Do you understand that?

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  Another aspect of your role in the offense

23   is whether you did anything to interfere with the investigation

24   of your offense.  Sometimes that gets considered.  It might

25   count against you as well.  Do you understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Okay.  And your prior criminal record, if

3     you have one, that gets considered under the guidelines too.  Do

4     you understand that?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  The last point I want to make is I want to

7     make sure you understand the general perspective of the

8     guidelines, and that is that the guidelines are designed to

9     consider a broad range of factors about you and your background

10    and about your crime and its impact on any victims and on

11    society, so you understand the general perspective of the

12    guidelines is to consider a broad range of factors?

13         THE DEFENDANT:  Yes, sir, I do.

14         THE COURT:  All right.  Very good.  So let's talk about

15    the procedure a little bit.  So Ms. Cwirla will prepare this

16    presentence report.  I'll get a copy, you and your lawyer will

17    get a copy, and the government will get a copy.  And when you

18    get that report, you should read it and review it very carefully

19    with your attorney, and if there's anything in that report that

20    you think is incorrect or if you think something important has

21    been left out or if you don't think the guidelines are

22    calculated right, you can raise objections to me.  Do you

23    understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  The government has the same opportunity to

1    make objections, and at your sentencing hearing, I'll rule on

2    any objections, and I'll make a final determination about what

3    goes in your presentence report and about what the final

4    correctly calculated guideline range is.  Do you understand that

5    process?

6              THE DEFENDANT:  Yes, I do.

7              THE COURT:  Okay.  All right.  Now, here's the most

8    important thing to take away:  That is that the guidelines are

9    advisory.  I will consider them, but I also have to consider

10   other things related to your sentence, and I will give some

11   consideration to the guideline sentence, but I don't have to

12   follow it strictly, so after I consider all the information that

13   I have, I can -- and I think -- if I think a sentence is

14   appropriate that's greater than the guidelines, that's what I

15   can do, and if I think a sentence below the guideline range is

16   appropriate, I can do that too.  So you understand that the

17   guidelines are only advisory?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  All right.  Now, by pleading guilty today,

20   you're going to give up some constitutional rights that you have

21   as a person who is accused of a crime, and I want to review some

22   of those rights with you.

23        Now, first of all, you understand in this case that you're

24   proceeding by an information instead of an indictment.  Do you

25   understand the difference between an information and an

1    indictment?

2              THE DEFENDANT:  No, sir, I don't.

3              THE COURT:  Okay.  Well, I'm going to review it with

4    you.  Okay.  So under the Constitution of the United States, you

5    have a right to require that the government get an indictment

6    before they prosecute you, and an indictment is a charge that's

7    written up and presented to the grand jury, and then the grand

8    jury has to decide if there's probable cause to believe that a

9    crime was committed and that you were the person who did it.

10   And that requires the government to present its case to the

11   grand jury, and the grand jury tests the case to make sure that

12   there's that probable cause.

13        The grand jury has 23 people on it.  They're drawn from the

14   judicial district, and there has to be at least 16 people to

15   have a quorum to do any business of the grand jury, and the

16   grand jury can return an indictment only if a majority of the

17   grand jury, that means at least 12 people, vote to indict you,

18   which means that they have looked at the government's case and

19   decided that there's enough evidence to believe that there's

20   probable cause that a crime was committed and that you're the

21   person who did it.

22        And so by proceeding on an information, you're proceeding

23   on the basis of a charge that's been written up but hasn't been

24   presented to the grand jury.  And so you understand that you

25   would be giving up your right to require that the government

present the case to the grand jury before they prosecute you.
Do you understand that?

THE DEFENDANT:  Yes, sir, I understand it now.

THE COURT:  Okay.  All right.  Very good.  Now, I don't
know if -- you have a waiver of indictment form down there?

MR. MOYERS:  We do.

THE COURT:  Okay.  And is it already signed?

MR. MOYERS:  It is.

THE COURT:  Okay.  Okay.  Mr. Caldwell, is this your
signature on here?

THE DEFENDANT:  Yes, sir, it is.

THE COURT:  Okay.  Very good.  I'll accept that waiver
of indictment, and I'll sign it myself.  Okay.  So we've handled
that.

So the next thing I want to make sure you understand is
that you know that you have the right to go to a trial in front
of a jury and have the jury decide if you're guilty?  Do you
understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you know that that jury would have 12
people on it and that that -- those 12 people would all have to
unanimously find you guilty beyond a reasonable doubt before you
could be convicted.  Do you understand that?

THE DEFENDANT:  Yes, sir, I do.

THE COURT:  And you know that you and Mr. Moyers would

be able to help choose the people that would serve on that jury. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, you also understand that under the Constitution of the United States, nobody can be forced to admit that they have committed a crime. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And this means that you don't have to plead guilty. You can stick with your plea of not guilty and, as we say, persist in that plea throughout the proceeding. Do you understand that you have the right to plead not guilty?

THE DEFENDANT: I understand.

THE COURT: Okay. Also means if the case went to trial, you wouldn't have to say anything, and I would tell the jury that they couldn't hold that against you in any way. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: So although you would have the right absolutely not to testify if that were your choice, you would also have the equal right, if this were your choice, to offer testimony. You would have the right to take the stand and testify, if that's what you wanted to do. Do you understand you'd have that right as well?

THE DEFENDANT: Yes, sir.

THE COURT: You'd also have the right to do what we

1    call confront and cross-examine the government's witnesses, and

2    that means you could confront them by facing them here in the

3    courtroom, and you could cross-examine them by having your

4    lawyer ask them questions.  Do you understand you'd have the

5    right to confront and cross-examine the government's witnesses?

6              THE DEFENDANT:  I understand, sir.

7              THE COURT:  You'd also have the right to call your own

8    witnesses to tell your side of the story, and even if they

9    didn't want to come and testify, you could compel them to come

10   here to court by using a subpoena.  Do you understand you'd have

11   the right to call witnesses and compel their attendance?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  All right.  Very good.  Now, a felony

14   offense affects your civil rights outside the scope of this

15   proceeding, and I want to review some of the ways that a felony

16   offense affects your civil rights.  So I can't remember from the

17   Pretrial Services report whether you have any previous felony

18   convictions.  Do you?

19             THE DEFENDANT:  No, sir.

20             THE COURT:  Okay.  Well, this is particularly important

21   for you then.  I want to make sure you understand that at least

22   under Wisconsin law while you're serving any term of

23   incarceration or under any form of supervision, you would not

24   have the right to vote.  Do you understand that?

25             THE DEFENDANT:  Yes, sir.

1      THE COURT:  You'd also not have the right to hold

2   public office or the right to serve on a jury.  Do you

3   understand that?

4      THE DEFENDANT:  Yes, sir.

5      THE COURT:  And I want to emphasize this one for you

6   too, and that is that as a person convicted of a felony, you

7   would be permanently deprived of the right to possess any kind

8   of firearm or ammunition.  Do you understand that?

9      THE DEFENDANT:  Yes, sir.

10      THE COURT:  And if you did possess a firearm or

11   ammunition for a firearm, you could be charged for a new crime

12   for that.  Do you understand that?

13      THE DEFENDANT:  Yes, sir.

14      THE COURT:  Okay.  The next thing I'm going to review

15   with you I don't think applies to you, but I review it with

16   everyone, and that is that if you're not a United States

17   citizen, a felony conviction could affect your residency or your

18   immigration status and could result in additional

19   immigration-related penalties, including deportation from the

20   United States.  Do you understand that?

21      THE DEFENDANT:  Yes, sir.

22      THE COURT:  But you are a United States citizen; is

23   that right?

24      THE DEFENDANT:  Yes, sir.

25      THE COURT:  Okay.  Very good.  Okay.  The last point

about your rights that I want to make sure that you're clear
with and that is you have a right to an attorney through all
phases of this proceeding, and that includes an attorney
appointed at government expense if you can't afford one.  So you
understand that you have the right to counsel in this --

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Very good.  The next thing
we're going to do is review the plea agreement.  I'm going to
ask Mr. O'Shea to review the basic terms of the plea agreement,
and when he's done, I'm going to come back to you and Mr. Moyers
and ask you to confirm that that is the agreement you've reached
with the government about your plea.

So, Mr. Moyers -- I'm sorry.  Mr. O'Shea.

MR. O'SHEA:  Thank you, Your Honor.  As indicated in
paragraph 1, Mr. Caldwell has agreed to plead guilty to Count 1,
the one-count information.

Paragraph 2 is a subset of those important constitutional
rights that the Court has just gone over with Mr. Caldwell.

Paragraph 3, as the Court has just gone over again with Mr.
Caldwell, reflects that if he's not a U.S. citizen, it could
affect his immigration status.  Doesn't seem to be the case.

Paragraph 4, the United States will recommend that Mr.
Caldwell receive the maximum available reduction for acceptance
of responsibility as long as he, in fact, has accepted
responsibility and continues to do so.

1    Paragraph 5, the government agrees that Mr. Caldwell's

2  guilty plea will completely resolve all possible federal

3  criminal violations that have occurred here in the Western

4  District of Wisconsin so long as the conduct relates to the

5  conduct described in the information and it was known to the

6  United States, so this agreement is limited to those types of

7  cases for which my office has exclusive decisionmaking

8  authority, and Mr. Caldwell understands that I will make my full

9  file available to the probation office for them to use in

10  preparing the presentence report.

11    Paragraph 6 deals with restitution.  The defendant agrees

12  to pay restitution for anything covered under the statutes, but

13  as I've already gone over with the Court, that's sort of as a

14  placeholder.  I am not personally sure whether any recoverable

15  restitution exists.

16    Paragraph 7, Mr. Caldwell will complete a financial

17  statement and return it to my office in a week, and he also

18  agrees that my office and the probation office can share

19  information back and forth in preparation for the presentence

20  report and for sentencing.

21    Paragraph 8, the United States reserves the right to make

22  all arguments in support of or in opposition to the sentence

23  imposed by the Court.

24    Paragraph 9, Mr. Caldwell understands that sentencing

25  discussions are not part of the plea agreement and that he

should not rely upon the possibility of a particular sentence based on discussions between Mr. Moyers and myself.

Paragraph 10, by the defendant's signature, he acknowledges his understanding that the government has made no promises or guarantees regarding the sentence to be imposed and also that the Court is not required to accept recommendations made by the United States.

And in paragraph 11, by our signatures this is the only plea agreement in this case.

You can disregard paragraph 12 because this is the approved plea agreement.

We do talk about promises here. So Mr. Moyers and I wanted to make something clear on the record. There is a parallel civil case involving 44 firearms. Mr. Caldwell will not be -- he can't have them back because he'll be a felon after this, so we've arranged, and Mr. Caldwell through Mr. Moyers has arranged, to have those firearms liquidated. So once Mr. Caldwell is sentenced, those firearms, which are essentially evidence, will be -- go to a firearms dealer, a licensed firearms dealer, who will sell the firearms, and then Mr. Caldwell will get the money from the sale, so I just want to make sure that was clear on the record.

THE COURT: All right. Very good. Thank you.

Okay. Mr. Moyers, is that your -- is this plea agreement that's Docket No. 5, is that your agreement with the government

1    with respect to your client's plea?

2              MR. MOYERS:  Yes, it is.

3              THE COURT:  Okay.  Mr. Caldwell, same question to you.

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  This is your agreement with the government

6    about your plea; is that right?

7              THE DEFENDANT:  Yeah.

8              THE COURT:  Okay.  And then, Mr. Moyers and Mr.

9    Caldwell, I'll ask you both to confirm that you agree with Mr.

10   O'Shea about the agreement regarding the firearms.  They'll be

11   sold by a licensed dealer, and Mr. Caldwell will get the

12   proceeds of the sale of those firearms; is that right, Mr.

13   Moyers?

14             MR. MOYERS:  That's correct, Your Honor.

15             THE COURT:  Mr. Caldwell, do you understand that?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Okay.  And you agree to that?

18             THE DEFENDANT:  Yes, sir, I do.

19             THE COURT:  All right.  Very good.  Then let me just

20   nail down yet again the question of restitution.  Do you

21   understand what restitution is?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Okay.  Tell me what you think it is.

24             THE DEFENDANT:  When you made a mistake and you hurt

25   somebody, you've got to pay to make it even.

1      THE COURT:  Yeah, that's right.  Okay.  So the plea

2   agreement --

3      THE DEFENDANT:  Monetary something.

4      THE COURT:  I'm sorry.  The plea agreement has an

5   agreement that you would pay restitution if it's warranted,

6   although at the moment it doesn't sound like there's any

7   identifiable victim that has a claim for restitution, but that's

8   at least I'll call it a conceptual possibility as a result of

9   your plea agreement.  Do you understand that?

10      THE DEFENDANT:  Yes, sir.

11      THE COURT:  Okay.  So it doesn't look like it will

12   apply, but if it turns out that there is some victim who is owed

13   restitution, I'll order you to pay that.  Do you understand

14   that?

15      THE DEFENDANT:  Yes, sir.

16      THE COURT:  Okay.  All right.  Very good.  Okay.  Mr.

17   Caldwell, let me ask you this:  Did anybody make any other

18   promises to get you to plead guilty?

19      THE DEFENDANT:  No, sir, they didn't.

20      THE COURT:  Okay.  Did anyone threaten you or try to

21   force you to plead guilty?

22      THE DEFENDANT:  No, sir.

23      THE COURT:  Did anyone tell you that you're going to

24   get some particular sentence in this case?

25      THE DEFENDANT:  No, sir.

1          THE COURT:  Okay.  Now, you know that the sentencing

2    decision will be up to me.  You understand that, right?

3          THE DEFENDANT:  Yes, sir, I do.

4          THE COURT:  Okay.  And I'm sure Mr. Moyers has advised

5    you about how the guidelines might work or what a reasonable

6    sentence might be or maybe he's -- you know, he's been in front

7    of me many time, so maybe he even tried to predict what I would

8    do in this case, but I want you to understand that you can't

9    absolutely count on those predictions or that advice.  Do you

10   understand that?

11         THE DEFENDANT:  Yes, sir.  We haven't talked about any

12   predictions.

13         THE COURT:  Okay.  So I'm going to sentence you to a

14   reasonable sentence, but what counts as a reasonable sentence is

15   going to be completely up to me.  Do you understand that?

16         THE DEFENDANT:  Yes, sir, I do.

17         THE COURT:  I'll listen to any arguments or

18   recommendations that Mr. Moyers makes or that Mr. O'Shea makes,

19   but ultimately the decision will be up to me.  Do you understand

20   that?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  And even if I don't follow any of the

23   advice or recommendations that either side makes, that does not

24   give you a basis to withdraw your guilty plea.  Do you

25   understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Okay.  All right.  Very good.  Okay.  Our

3     next task is to determine that there's a factual basis for the

4     plea, and as I said, what that means is that there's reason for

5     me to believe that you're actually guilty before I have you

6     plead guilty to a crime.  So I'm going to ask Mr. O'Shea to tell

7     me what the government would be prepared to prove if the case

8     went to trial, and when he's done, again I'm going to come back

9     to you and Mr. Moyers and ask you both to confirm that the

10    government can prove those things.

11         So, Mr. O'Shea?

12         MR. O'SHEA:  Yes, Your Honor.  This will be a little

13    bit more extensive than some of our offers because what we're

14    talking about is a two-year period, and also we're describing

15    the running of a business.

16         THE COURT:  Okay.

17         MR. O'SHEA:  It actually starts before the December

18    15th, 2015, date, so about six months before that the Milwaukee

19    police executed a drug search warrant in a man's home.  They

20    found at that home a Glock 10 millimeter pistol that the ATF was

21    able to trace back to Mr. Caldwell.  Mr. Caldwell bought the gun

22    through Mr. Killian, a federal firearms licensee, on June 2nd,

23    2015, so -- and then the search warrant was executed just the

24    next day.  So one day Mr. Caldwell has it; the next day it winds

25    up in a drug house over in Milwaukee.

1    So ATF investigated this, continued to investigate this

2    matter trying to figure out what was going on.  On October 21 of

3    the same year, 2015, an ATF Industry Operations Investigator, a

4    person by the name of Casimir Mleczko, conducted a compliance

5    inspection on Mr. Killian, the person who sold Mr. Caldwell the

6    weapon.  During the inspection the inspector determined that Mr.

7    Caldwell purchased at least 41 firearms from Mr. Killian over a

8    one-year period.  He investigated further, determined that

9    Mr. Caldwell had no reportable income from 2012 through that

10   date, so then we get then to the beginning of the charges,

11   December 15th, 2015.

12       An ATF agent, Anthony Rotunno, interviewed Mr. Caldwell at

13   his home on Martha Lane here in Madison, Wisconsin, which is in

14   the Western District of Wisconsin.  Mr. Caldwell said, yeah, he

15   was on a very limited income from social security and

16   disability.  He purchased 30 to 40 firearms annually spending

17   about $2,000 a month on them.  He purchased many weapons to see

18   which he liked, and then he sold the ones that he didn't like

19   through Armslist.  He remembered selling the particular weapon

20   to a person by the name of Kevin Sweepee.

21       So Mr. Rotunno, Special Agent Rotunno, gave Mr. Caldwell an

22   ATF warning letter for unlicensed firearms dealings, sort of a

23   warning letter saying knock it off.  The warning letter

24   identified that Mr. Caldwell's firearm activity appeared to be

25   within the definition of a firearm dealer based on the number of

purchases, structuring of transactions, the number of firearms

recovered during various police investigations where Mr.

Caldwell was the original purchaser, and the letter essentially

said -- told Mr. Caldwell he had to stop engaging in the

business of dealing firearms until he became a federally

licensed firearms dealer.  Either be one or not.

THE COURT:  Now, you said that the structuring of the

transactions?

MR. O'SHEA:  Well, there was -- yeah.  There was

something about the way that Mr. Caldwell was obtaining firearms

from Mr. Killian that looked suspicious to the ATF, without

getting more into it.  Mr. Caldwell signed the warning letter,

and he told Special Agent Rotunno he would stop selling guns

because the traces did not look good.  He didn't want to be in

trouble.  At the time Mr. Caldwell admitted to possessing 15 of

the 41 firearms that he'd purchased.

And then on September 26, 2017, the investigation with Mr.

Caldwell sort of restarts through Special Agent Mike Klemundt,

to my left, when on that date, March [verbatim] 26, 2017, the

Madison Police Department found another person, a person by the

name of Kenneth House, to be in possession of cocaine and a

Taurus 9 millimeter pistol.  They traced that weapon back to Mr.

Caldwell, who had purchased it just two weeks before it was

recovered from Mr. House.

So Special Agent Klemundt continued to investigate,

1    determined that Mr. Caldwell still was not a federally licensed

2    firearms dealer, discovered between 2004 and 2017 that 11

3    different firearms were recovered during police investigations

4    that traced back to Mr. Caldwell as the original purchaser with

5    four of those traces taking place after December 15th, 2015,

6    when Special Agent Rotunno had served Mr. Caldwell with the

7    letter.

8            THE COURT:  What was the date of the letter?  I'm

9    sorry.

10           MR. O'SHEA:  The same date of the -- it was served on

11   Mr. Caldwell on December 15th, 2015, so that's why we picked

12   that as the first date in the information.

13           THE COURT:  Okay.

14           MR. O'SHEA:  So Special Agent Klemundt then begins to

15   investigate and collect records from different firearms sellers

16   and Armslist and so on, and he found that Mr. Caldwell had

17   purchased at least 95 handguns and 11 rifles from 57 different

18   sellers since being served with that ATF warning letter on

19   December 15th, 2015.

20           THE COURT:  Give me those numbers again.  95 --

21           MR. O'SHEA:  95 handguns, 11 rifles.

22           THE COURT:  And this is all after the warning letter?

23           MR. O'SHEA:  After the warning, yeah, and then in

24   addition, and this is another number for you to write down, is

25   Special Agent Klemundt determined that after the warning letter,

Mr. Caldwell had posted 202 advertisements for firearm sales on Armslist, and Armslist is an online -- it's a website where people can get together and trade/sell firearms back and forth. It's devoted for the most part to firearms. In the advertisements Mr. Caldwell would often describe the firearms as new, like new, or as new. He described ten firearms as unfired, and on numerous occasions -- I don't think I need to walk through them unless Mr. Moyers suggests I do -- numerous occasions Mr. Caldwell offered a gun of the same description on the same day or soon after Mr. Caldwell himself had purchased it, and Mr. Caldwell also purchased and then offered for sale multiple guns of the same make and model.

So skipping then ahead to December 5, 2015 [verbatim], Special Agent Klemundt searched Armslist for firearms being sold in the Madison area, found a Walther 40 caliber pistol that appeared to be being sold by Mr. Caldwell here. Special Agent Klemundt responded to the Armslist advertisement to an email address. Turns out to be Mr. Caldwell. The two men, Special Agent Klemundt acting in an undercover capacity and Mr. Caldwell, arranged that Mr. Klemundt would purchase the pistol and a box of ammunition, and on December 8th, 2017, Special Agent Klemundt, along with another special agent, Timothy Rorabeck, went to Mr. Caldwell's Madison, Wisconsin, residence here in the Western District of Wisconsin. Special Agent Klemundt paid Mr. Caldwell $500 for that pistol.

1          Unfortunately, as the investigation was ongoing, on

2    February 13th, 2014 [verbatim], a Chicago police --

3          THE COURT:  I'm sorry.  Could you tell me the date of

4    the purchase, December 5th, 2017?

5          MR. O'SHEA:  So that was the original communication.

6    The actual purchase occurred on December 8th, 2017.

7          THE COURT:  Okay.  And so the -- kind of the

8    investigation goes back to 2015, right?

9          MR. O'SHEA:  Correct.  That's when it's -- the

10   investigation -- that's when we pick as the date of dealing as a

11   firearms dealer because he was given the warning letter, said,

12   "Hey, you know, either become a licensee or knock it off."

13         THE COURT:  Okay.

14         MR. O'SHEA:  Unfortunately, as the investigation is

15   ongoing, a policeman down in Chicago was killed on February

16   13th, 2018, was killed by a four-time convicted felon who used a

17   Glock 9 millimeter pistol traced back to Mr. Caldwell.

18         So the day after that officer is killed, February 14th,

19   2018, an ATF task force officer interviewed Mr. Caldwell at his

20   residence.  Mr. Caldwell confirmed that he had -- that he'd

21   possessed that weapon, and he transferred it -- he possessed and

22   transferred it several times last selling it to this Kevin

23   Sweepee in approximately May 2017.  Mr. Caldwell described

24   several recent firearm transactions, showed the officer a large

25   inventory of firearms inside his residence, and explained that

selling firearms was like an addiction.

A couple days after that, February 16th, 2018, the officers executed a search warrant at Mr. Caldwell's residence, seized documents, notebooks, those 44 firearms, a computer, and a cell phone.

Even after that, on March 18th, 2018, another ATF undercover agent purchased a firearm from Mr. Caldwell through Armslist.  Purchased a pistol for $290 from Mr. Caldwell.

On May 16th, 2018, ATF Special Agents Michael Klemundt and, again, Tony Rotunno interviewed Mr. Caldwell at the U.S. Attorney's Office.  Mr. Caldwell admitted he's not a licensed firearms dealer.  He understood the process but claims he became frustrated with all the paperwork and decided not to do it.  Mr. Caldwell -- they talked about his income.  Mr. Caldwell said he lived a simple lifestyle getting only $200 a month in food.  He thought he had approximately $100 left over after paying all of his expenses and that cash deposits into his accounts would be from gun sales.  Counting cash deposits exceeding -- and this is a focus on the bank deposits.  If one were to count cash deposits exceeding $100 into any of Mr. Caldwell's bank accounts after December 15, 2015, it shows more than $19,000 in cash deposits.

So those are the facts the United States would rely upon to prove the information.

THE COURT:  Okay.  Mr. Moyers, I'll start with you.

1    Can the government prove all those things?

2               MR. MOYERS:  They can prove those things.

3               THE COURT:  Okay.  Mr. Caldwell, same question to you:

4    Can the government prove those things?

5               THE DEFENDANT:  Yes, sir.

6               THE COURT:  All right.  Mr. Caldwell, I'm just going to

7    ask you to tell me in your own words what you did that led to

8    your being charged with selling firearms without a license.

9               THE DEFENDANT:  I bought and sold firearms without a

10   license.  I didn't have a license, and I was doing it.  I was

11   selling.

12              THE COURT:  Okay.  And you were selling them at a

13   relatively high volume; is that right?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  Okay.  And these were guns that you didn't

16   intend to use for yourself; is that right?

17              THE DEFENDANT:  Correct.

18              THE COURT:  Mr. O'Shea, I don't know if there's

19   anything else you think that I need to review here.  I don't

20   know if there was -- what is the knowledge element that has to

21   be proven here?

22              MR. O'SHEA:  That he willfully engaged in the business

23   of dealing firearms, in other words, that he knew he wasn't

24   supposed to be --

25              THE COURT:  Yeah.

1          MR. O'SHEA:  -- based on the letter.  He was flat out

2    told he wasn't supposed to.

3          THE COURT:  Yeah.  So, Mr. Caldwell, do you acknowledge

4    that, that you knew that you shouldn't have been selling those

5    firearms?

6          THE DEFENDANT:  I didn't think I was doing it as a

7    business.  I thought it was legal, but it was brought to my

8    attention it was illegal.

9          THE COURT:  Yeah.  Okay.  So when you got that letter

10   in December 2015, then you knew what you were doing was against

11   the law?

12         THE DEFENDANT:  Yes.

13         THE COURT:  All right.  Mr. O'Shea, anything else you

14   think I need to review?

15         MR. O'SHEA:  Nothing.

16         THE COURT:  All right.  I'm going to ask you then, Mr.

17   Caldwell, what is your plea to Count 1 of the information?

18         THE DEFENDANT:  Guilty.

19         THE COURT:  Okay.  On the basis of this discussion with

20   you and your attorney, on the basis of the record in the case as

21   a whole, I'm satisfied that you've entered a plea of guilty

22   knowingly and voluntarily, that you've done so after having an

23   adequate opportunity to consult with your attorney, that you

24   understand both the nature of the charge against you and the

25   consequences of a plea of guilty.  I'm also satisfied that

1    there's a factual basis for the plea.  Accordingly, I find and

2    adjudge you guilty of the charge contained in the information.

3    I'll accept the plea agreement conditionally pending a review of

4    the presentence report.

5         So one of our tasks is to set the schedule, and I believe

6    the parties have already reached an agreement about the date for

7    the sentencing hearing, so let me just take a look at my

8    calendar to make sure that that will work for me as well.  Okay.

9    It does.  So let me just make sure the parties are -- confirm

10   that the presentence report is going to be available on October

11   12th and that objections would be due on October 19th, and then

12   the sentencing would be -- sentencing hearing would be on

13   November 1st, 2018, at 11:00 a.m., and that is a Thursday.

14        So I'll start with you, Mr. Moyers.  Is that your agreement

15   about the schedule?

16             MR. MOYERS:  It is.

17             THE COURT:  Mr. O'Shea?

18             MR. O'SHEA:  Yeah.

19             THE COURT:  Okay.  Very good.  Okay.  So that's our

20   schedule, and let me remind people:  Everybody -- counsel in

21   this case are familiar with my practices here, so the ordinary

22   materials that I need in connection with the sentencing,

23   sentencing memorandum, letters in support, that kind of thing, I

24   only need two business days in advance.  This strikes me as a

25   case that might pose complicated issues perhaps.  I don't know.

1    Maybe not.  But if there is anything that's more complicated

2    than the usual materials, please give them to me a little bit --

3    give me a little bit more of a heads-up on it, and if there's

4    anything that's going to be a substantial factual dispute about

5    the relevant conduct and that we need to have evidence for

6    that -- I assume that that would likely come from Mr. Moyers if

7    there were a need for that -- give us a heads-up on that so I

8    know to make sure that I leave enough time to hear that evidence

9    and the government has enough time to get it together if it's

10   going to be contested.  So ordinary stuff, two days; anything

11   else that's more complicated, give me a little bit more of a

12   heads-up.

13       Okay.  So I understand that Mr. Caldwell has so far been

14   released on conditions, and let's find out if the government has

15   any objection to his continued release on those same conditions

16   or whether we need to take different action.

17       Mr. O'Shea?

18       MR. O'SHEA:  Well, this is his first appearance, so

19   this will be the first time they're imposed.  The United States

20   agrees with the proposed conditions and agrees with release on

21   those conditions.

22       THE COURT:  Okay.  All right.  Good.  All right.  And

23   so those conditions are -- and so, Mr. Moyers, have you reviewed

24   the conditions with Mr. Caldwell?

25       MR. MOYERS:  Yes, I have.

1       THE COURT: Okay. And so, Mr. Caldwell, have you seen

2  all of those conditions that are --

3       THE DEFENDANT: Yes, sir.

4       THE COURT: -- imposed on your continued release?

5  Okay. I'm going to fill in on Condition No. 6 one of the

6  conditions is that you should next appear at this location,

7  which is the Western District courthouse. And you're going to

8  appear at 11:00 a.m. on November 1st, 2018. That's your next

9  appearance. Okay. And so the standard conditions for all

10  released defendants -- and let me ask you, Mr. Moyers, would you

11  like me to read all these conditions here or are we satisfied

12  that Mr. Caldwell has understood them?

13       MR. MOYERS: No. Yeah, I don't think you need to go

14  over them. We've read through them, and he understands.

15       THE COURT: Okay. So conditions 1 through 12 are part

16  of the standard conditions, Mr. Caldwell, that everybody has to

17  follow when they're released pending a sentence or trial, but I

18  want to go over specifically the additional conditions that are

19  imposed on you.

20     Condition No. 15 is imposed, and that is that you shall not

21  use or possess firearms, destructive devices, or any other

22  dangerous weapons. Do you understand that?

23       THE DEFENDANT: Yes, sir.

24       THE COURT: Okay. And do you drink alcohol?

25       THE DEFENDANT: No, sir.

1    THE COURT:  Okay.  And so is there any objection to my

2    ordering that Mr. Caldwell abstain from alcohol, Mr. Moyers?

3    MR. MOYERS:  No, Your Honor.

4    THE COURT:  Okay.  I'm going to order that you abstain

5    from the use of alcohol.  Obviously you have got some mental

6    health issues, and you have medication that could interact with

7    the alcohol anyway, so I'm going to order Condition No. 16 is

8    that you shall abstain from any use of alcohol, and I believe

9    that those are the only special conditions that are imposed, but

10   I need to make sure that you understand that if you violate any

11   of these conditions, Mr. Caldwell, I can revoke your release

12   pending your sentencing, and I could have you held in custody

13   pending your sentence.  And so if you want to stay out and at

14   liberty pending your sentence, you'll have to follow these

15   conditions.  Do you understand that?

16   THE DEFENDANT:  Yes, sir.

17   THE COURT:  Okay.  So I'm going to order that you'll be

18   released after processing in the ordinary course of business,

19   and then you will also have to acknowledge on this form, Mr.

20   Caldwell, that you have reviewed these conditions, and you're

21   going to sign and acknowledge them.  Do you understand that?

22   THE DEFENDANT:  Yes, sir.

23   THE COURT:  Okay.  And the date today is August 8th?

24   MR. MOYERS:  September 6th.

25   MR. O'SHEA:  September 6th.

1            THE COURT:  I'm sorry.  Okay.  So I have signed that

2    release order, and I'll give it to the clerk, and she'll arrange

3    for Mr. Caldwell to acknowledge those.

4        Okay.  I think we've covered everything, but let me find

5    out if there's anything else we need to address this morning.

6    Mr. O'Shea, anything else?

7            MR. O'SHEA:  Nothing for the United States.

8            THE COURT:  Okay.  Mr. Moyers?

9            MR. MOYERS:  No, we got it all.

10           THE COURT:  All right.  Very good.  Thank you, all.

11           AGENT BAKER:  Your Honor?

12           THE COURT:  Yes.

13           AGENT BAKER:  Could we just have a clarification that

14   at the time of the home visit, Mr. Caldwell was directed to

15   remove all ammunition, gunpowder from his residence.  If he

16   could be ordered to do that so we can verify that that has been

17   done.

18           THE COURT:  Okay.  I will verify that that is correct,

19   you've been ordered to remove all gunpowder or what else?

20           AGENT BAKER:  Ammunition.

21           THE COURT:  Ammunition and gunpowder has been removed

22   from your house?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Do you understand that?  And then the

25   probation office is going to verify that.

1          THE DEFENDANT:  Right.

2          THE COURT:  Okay.  All right.  Very good.

3          AGENT BAKER:  Thank you.

4          THE COURT:  Thank you.

5          THE CLERK:  This court stands in recess.

6       (Proceedings concluded at 11:53 a.m.)

7                            ***

1    I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2 Reporter in and for the State of Wisconsin, certify that the

3 foregoing is a true and accurate transcription of the digital

4 recording of the proceedings held on the 6th day of September,

5 2018, before the Honorable James D. Peterson, Chief U.S.

6 District Judge for the Western District of Wisconsin.

7    Dated this 13th day of September, 2018.

8

9

10

11

12

13       _____/s/ Jennifer L. Dobbratz_____

14       Jennifer L. Dobbratz, RMR, CRR, CRC
          Federal Court Reporter

15

16

17

18

19

20

21

22

23

24 The foregoing certification of this transcript does not apply to
  any reproduction of the same by any means unless under the

25 direct control and/or direction of the certifying reporter.