UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

      Plaintiff,

 -vs-                        Case No. 18-CR-114-JDP

THOMAS CALDWELL,             Madison, Wisconsin
                              November 1, 2018
        Defendant.         11:03 a.m.

---

STENOGRAPHIC TRANSCRIPT OF SENTENCING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                Office of the United States Attorney
                BY:  TIMOTHY M. O'SHEA
                    CHADWICK M. ELGERSMA
                Assistant United States Attorneys
                222 West Washington Avenue, Suite 700
                Madison, Wisconsin  53703

For the Defendant:

                Federal Defender Services of Wisconsin
                BY:  PETER R. MOYERS
                22 East Mifflin Street, Suite 1000
                Madison, Wisconsin  53703

Also appearing:   THOMAS CALDWELL, Defendant
                CATHERINE CWIRLA, U.S. Probation Officer
                Special Agent MICHAEL KLEMUNDT, ATF

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

1                    (Proceedings called to order at 11:03 a.m.)

2          THE CLERK:  Case No. 18-CR-114-JDP, *United States of*

3 *America v. Thomas Caldwell*, called for sentencing.

4       May we have the appearances, please.

5          MR. O'SHEA:  Good morning.  Tim O'Shea for the United

6 States.  With me is Special Assistant U.S. Attorney Chad

7 Elgersma and Special Agent Mike Klemundt from ATF.

8          THE COURT:  Good morning to all of you.

9          MR. MOYERS:  Peter Moyers from Federal Defender

10 Services, and seated here to my left is Mr. Caldwell.

11         THE COURT:  Mr. Caldwell, Mr. Moyers, good morning to

12 you.

13         MR. MOYERS:  Good morning.

14         THE COURT:  All right.  So we're here for Mr.

15 Caldwell's sentencing.  I'll note that Katie Cwirla is in the

16 courtroom with us.  She's the probation officer who prepared the

17 presentence report that has the information I'll use in setting

18 the sentencing -- setting the sentence.

19       Let me run down the materials I've reviewed in connection

20 with the sentencing.  I have got the presentence report.  I have

21 got a statement of no objections from either side, although I

22 think that Mr. Moyers made a clarification about the financial

23 background of Mr. Caldwell.  Then I've got an addendum and a

24 revised presentence report, sentencing memos from both sides,

25 and then Mr. Moyers attached some letters in support for Mr.

1  Caldwell to his memo and also then submitted one more letter

2  separately.

3       That's what I've looked at.  Mr. O'Shea, did I miss

4  anything on your side?

5            MR. O'SHEA:  No, Your Honor.

6            THE COURT:  Mr. Moyers, get everything from your side?

7            MR. MOYERS:  You got it all.

8            THE COURT:  All right.  Very good.

9       Okay.  Mr. Caldwell, I need to make sure that you've read

10  the presentence report and the addendum, the revised presentence

11  report, and discussed those documents with your lawyer.  Have

12  you done that?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  And do you have any other concerns with the

15  presentence report?

16            THE DEFENDANT:  None, no.

17            THE COURT:  All right.  Very good.  So I'll adopt the

18  facts in the presentence report as the facts on which I'll base

19  my sentence.  I will accept the plea agreement.  The offense of

20  conviction adequately reflects the defendant's criminal conduct,

21  and I don't think the plea agreement undermines the statutory

22  purposes of sentencing.  So in determining the defendant's

23  sentence, I will consider the guidelines, and I'll also consider

24  the statutory purposes of sentencing that are set out in Title

25  18 of the United States Code at Section 3553(a).

1        Let's make a record of where we ended up with the

2    guidelines here.  The calculations took into account all the

3    relevant conduct, and I find that they're correctly calculated

4    in the presentence report.  The guideline for the unlicensed

5    sale of firearms is in guideline Section 2K2.1.  The base

6    offense level is 12, and we have some enhancements here.

7        We've got eight levels added under subsection 1(b)(1)(D)

8    because the offense involved at least a hundred but less than

9    199 firearms.

10       We have four levels added under subsection 1(b)(5) because

11    the defendant engaged in the trafficking of firearms.

12       There aren't any other Chapter Two adjustments, so the

13    total offense level is 24.

14       The defendant qualifies for what I anticipate will be three

15    levels of downward adjustment, two because he's demonstrated

16    acceptance of responsibility for his offense and I think one

17    more because I believe the government is going to move for the

18    additional reduction, but let's confirm that.

19            MR. O'SHEA:  So moved, Your Honor.  Thank you.

20            THE COURT:  All right.  I grant that.  So that's three

21    levels of adjustment for acceptance, and that gives us a total

22    offense level of 21.  Defendant's criminal history category is

23    I -- he has no criminal record -- and the defendant has an

24    advisory guideline imprisonment range then of 37 to 46 months.

25       So that's as far as the guidelines take us.  I do have the

sentencing memoranda from both sides, so I have a general sense of the perspective from both sides, but let's find out what else I need to know.  Mr. O'Shea.

MR. O'SHEA:  Well, two former colleagues of Police Commander -- Chicago Police Commander Paul Bauer are here, Chief Noel Sanchez of the Chicago Police Department and former Chicago Police Superintendent and now Northeastern Illinois University Police Chief John Escalante are here.  Chief Escalante would like to speak to the Court on behalf of the Bauer family, and I propose we start with that.

THE COURT:  Let's do that, by all means.

Go ahead, sir.

CHIEF ESCALANTE:  Good morning.  Thank you.  I'd first like to actually say a few thank-yous.  First, I'd like to thank the Court for giving me the opportunity to speak today.  I want to thank the Chicago Police Department for having Chief Noel Sanchez represent the 12,000 men and women of the Chicago Police Department, and I'd like to thank the U.S. Attorney's Office here and the ATF agents, who I know did everything they could regarding the investigation of this case.

I'll apologize in advance too because in my 32 years of law enforcement, I've probably appeared in court hundreds of times.  This is different, and I can already feel it being different.  So I want to tell you, Your Honor, for a few minutes just about Paul Bauer, who everyone else in the city has now come to know

1    as Commander Paul Bauer.  Paul had been my friend since the age

2    of 7, first grade.  We grew up on the southwest side of the City

3    of Chicago, and we started out as first graders at St. Clare of

4    Montefalco, and from there Paul and I were the only two in our

5    class that went to high school at Saint Ignatius College Prep.

6         And from there Paul and I started out together at Northern

7    Illinois University.  I spent a little too much time being

8    social, and after my second year the university politely asked

9    me to find another university to attend, but Paul stayed focused

10   and Paul graduated on time, and then we spent 30 years together

11   working for the Chicago Police Department.  So I appreciate the

12   fact that I can speak about Paul and I can speak on behalf of

13   the Chicago Police Department and what they lost, and as hard as

14   it is, I will do my best to be able to speak for the Bauer

15   family and what they lost.

16        So for the Chicago Police Department, Paul rose through the

17   ranks of commander -- up to the rank of commander.  He was the

18   commander of the 18th District, had probably just over 300

19   officers assigned to him.  He was incredibly well respected.

20   It's not often and you accept as you move up the ranks in

21   policing or probably any position in management that you're not

22   going to be liked by everyone.  It's not necessarily your job to

23   be liked.  It's to be fair and do the job properly.  I would say

24   Paul was just about liked by everyone, and I think if you ask

25   those 300 officers, they would tell you that.

1    As far as his family, Paul was the youngest of four.  He

2    had three older sisters, who probably in each of their own way

3    were pseudomothers to him.  His mother, unfortunately, just

4    passed away just about two months ago, but Paul always had his

5    sisters looking out for him as well as his parents.  As I

6    mentioned, we went to St. Clare and St. Ignatius.  Paul was very

7    much a devout Catholic.  He had a very strong belief and faith

8    in God, and he had a very strong sense of family.  His family,

9    his wife Erin, his daughter Grace, meant everything.

10    I spoke at his eulogy, and I talked about -- I was always

11    fortunate to have advanced all the way to the position of

12    superintendent, and so even though we were friends, I feel very

13    awkward by saying for the last half of our careers in some ways

14    I was Paul's supervisor, but with each promotion before he

15    accepted it, Paul and I would talk because he was afraid that

16    accepting those promotions certainly meant he was going to be

17    busier, and he was going to have more responsibility, and he was

18    afraid of the time it would cost him with his family, but he

19    accepted them, and he excelled at them.

20    And now it's been hard on his family.  I know they have

21    good days; I know they have bad days.  I know, like me, they

22    have every text, every email, and I know they periodically go

23    back and look at those, like I do, because they are things that

24    just make us laugh.  I don't know how his family has managed to

25    move on.  I mean, they really haven't moved on, but as far as

1    getting through each and every day, I don't know how they do it

2    other than I know that they're incredibly strong people.  I said

3    Paul grew up with a very strong family, good parents, and that's

4    reflective in his own family with Grace and Erin and how the

5    rest of his family have come together with them.

6        I can tell you personally that he was just a very caring

7    person because when I became the interim superintendent, it was

8    during a very difficult time in the city, and it was for me

9    personally a very stressful time because I wasn't anticipating

10   being put in that position.  I have told this to a few people,

11   not a lot, but a few people.  For the personal stress, so to

12   speak, that that position put on me unexpectedly, I think the

13   only person that worried about me more in those first few weeks

14   as the interim superintendent -- the only person that worried

15   about me more than my mom was Paul, and he had a way of, each

16   day for those first few weeks, of reaching out to make sure I

17   was okay through a text, an email, a phone call, if he was in

18   the headquarters, popping in the building.

19       But you had to know Paul and his sense of humor.  He didn't

20   reach out to me and say, "Hey, are you doing okay?  How are

21   you?"  Paul found something every day that he could make fun of

22   me about just to make me laugh because every day there was

23   something in the press, there was a press conference, there was

24   a story, there was a meeting, a department meeting, there was a

25   change in policy, and every day he found something that he could

1  just poke fun at me about because he wanted to make me laugh.

2  And that was his way of just making sure I was doing okay.

3  Excuse me.  And I worry because I don't know who right now can

4  do the same thing for his family to make sure that each day they

5  find something that can make them smile or make them laugh.

6      So I'll close my thoughts with this, Your Honor:  Again,

7  I'm in my 32nd year of policing and actually took over the

8  department at a time where we needed to make some significant

9  changes, as a lot of police departments around the country have

10  had to do over the last couple of years, and understandably so,

11  for a lot of police departments, we have not been as accountable

12  to some parts of the city that we represent as probably we

13  should have been, and that's changing, and every police

14  department needs to always make sure they are doing the right

15  things to hold themselves accountable.  But that accountability

16  also has to be on those that are responsible for the violence or

17  those that put the guns into the hands of those that commit the

18  violence.  There has to be accountability for those people as

19  well.

20      I've been a poor friend to Paul since his murder.  I have

21  yet to call it his death because you die of old age, you die of

22  sickness, you die from accidents, but when someone fires

23  multiple rounds into your body, that's not dying.  That's a

24  murder.  I have been a poor friend to Paul since the murder

25  because I have not gone back to the cemetery since the day we

1    buried him.  I just haven't had the personal strength to do it,

2    but when I was asked to speak in court today, I told myself it

3    would be the reason why I would go back, and I'll go back to the

4    cemetery in the next couple days.  I want to be able to go back

5    and tell him that justice was served here today, and I'll go

6    back and tell him how much I miss him as a friend.

7         I just hope you'll take everything into consideration, Your

8    Honor, and I thank you again for the opportunity to speak.

9         THE COURT:  Well, thank you.  Please accept my

10   condolences on your loss, the loss to the family, and to the

11   department, and you've been a good friend to Commander Bauer

12   today, so thank you for sharing your comments.

13        MR. O'SHEA:  Thank you, Your Honor.  So we've got the

14   guidelines that are correctly calculated.  At this point we

15   decide whether or not to follow that advice in the context of 18

16   U.S.C. 3553, as the Court has said, and I'm going to focus on

17   three aspects --

18        THE COURT:  Pull the microphone over just a little bit.

19        MR. O'SHEA:  Yeah.  Sure.  Thank you.

20        THE COURT:  Thank you.

21        MR. O'SHEA:  I'm going to focus on three aspects of

22   3553, and the first one is we want the sentence imposed to

23   reflect the seriousness of the crime, and the defendant, as we

24   know, sold lots and lots of guns.  He did so -- the way he did

25   so was indiscriminate, and he removed sort of the legal

1    structures, sort of the guardrails, that are intended to prevent

2    dangerous people from getting guns.  Now, I know the

3    defendant -- you know, we can't put all of the nation's woes

4    with guns, many woes with guns, on Mr. Caldwell's shoulders.

5    That's not fair.  But the defendant -- what we can see that he

6    did, he clearly amplified the dangerousness of dangerous people.

7    The defendant's guns repeatedly wound up in the hands of

8    dangerous people, and as I said in my memorandum, a tragedy was

9    almost inevitable in this case, and, unfortunately, it happened.

10        A rough analogy is, and we see this, unfortunately, often

11   enough, is of a heroin dealer, right?  They sell a thousand

12   doses, and then one time somebody tips over, and how accountable

13   should that person be for the person who dies?  And heroin, as

14   dangerous and as totally heartbreaking as that is, is only

15   dangerous once.  The guns that Mr. Caldwell sold are dangerous

16   forever in the wrong hands.  Except for the guns -- and the

17   defendant admits in the context of the guidelines he's being

18   responsible for over a hundred guns -- except for those

19   recovered by law enforcement that they took away from the

20   defendant or that they purchased from the defendant from

21   undercover purchases or the ones we've already known have been

22   recovered at crime scenes, we don't know where the rest of the

23   defendant's guns were.  We know he was really indiscriminate on

24   who he sold them to.  As reflected in the presentence report

25   addendum, we learned of a 12th firearm recovered at a crime

1    scene that we learned about after the defendant pled guilty.  So

2    that is, I respect -- so that's one reason, big reason I

3    suggest, that a guideline sentence is appropriate.

4         And then the other two reasons under 3553 are specific

5    deterrence and general deterrence, and I'm going to address

6    specific deterrence first.  Attorney Moyers -- and one thing is

7    to protect the public from further crimes of the defendant, and

8    Mr. Moyers writes that he believes that the defendant will not

9    commit gun crimes in the future, and given the time line that

10   I'll briefly review, I lack Mr. Moyers' certainty, and this is

11   why:

12        The defendant -- and Mr. Moyers has very thoughtfully

13   explored lots of cases that have happened here in the Western

14   District of Wisconsin.  This is what's different about this case

15   is Mr. Caldwell's -- whether it's because of his mental illness

16   or because of his desire or whatever, he just refused to stop

17   selling guns, and that is what's unique.  So let's explore the

18   time line a little bit.

19        On December 15, 2015, ATF Agent Rotunno sat down with Mr.

20   Caldwell, went over the paperwork, and showed him that, "Look, a

21   gun you sold, a Glock pistol you sold on June 2nd, 2015, was

22   found the very next day in a Milwaukee drug house," so Agent

23   Rotunno gives Mr. Caldwell a letter and says, "Hey, you can't

24   sell without a license," and with that he also hands him an

25   application.  "Here is an application.  This is what you do to

1    get going.  If you want to be a federally licensed ATF guy, this

2    is what you have to do," and Mr. Caldwell didn't stop.

3        Instead, we know that he purchased at least 95 guns and 11

4    rifles from 57 different sellers.  He posted 192 advertisements

5    for firearm sales on Armslist.  It's about nine a month.  And we

6    learned that the defendant had continued to engage in this

7    practice in September 2011 when Kenneth House, who was already a

8    convicted felon and drug dealer, was found with a gun that Mr.

9    Caldwell had himself purchased only two weeks prior.  Now, that

10   same Kenneth House is now awaiting sentencing before Judge

11   Conley for possessing yet another gun, and he's also facing

12   attempted murder charges over in Dane County Circuit Court.  So

13   the defendant was just highly indiscriminate with these guns.

14       And then, as we know, Mr. Bauer, Commander Bauer, was

15   killed.  The very next day the defendant is confronted with that

16   again.  So he's confronted, the defendant, on February 14th,

17   2019 [verbatim], and he's asked about that Glock pistol used to

18   kill Commander Bauer, and then two days after that ATF, on

19   February 16, 2019 [verbatim], ATF executes a search warrant.

20   They're like, "Well, listen, we're going to put a stop to

21   this" --

22       THE COURT:  Just to keep the time line correct, we're

23   talking 2018 --

24       MR. O'SHEA:  2018.  I apologize.  I misspoke.  So that

25   was on -- they spoke to Mr. Caldwell on February 14th, 2018,

about the Glock pistol that had been used to kill Commander Bauer just the day before on February 13, 2018, and then two days later on February 16, 2018, ATF executed a search warrant of Mr. Caldwell's house where they thought they seized his entire inventory, 44 firearms, so they thought if he won't stop, we have to stop him, but even that didn't stop Mr. Caldwell.

So a month after they seize what they thought was all his firearms, Mr. Caldwell sold another firearm, a handgun, to a complete stranger to Mr. Caldwell in a Walgreens parking lot, and he'd advertised that handgun again through Armslist. But he used a made-up name then, Larry Schultz. So that transfer happened on March 18, 2018.

So then on May 16, 2018, ATF talked to Mr. Caldwell again, and he admitted these crimes, although he minimized, but he admitted, he confessed essentially, he had been selling guns on May 16, 2018. Even then Mr. Caldwell didn't stop. He sold another gun, a rifle, to the same undercover ATF agent, on May 31, 2018.

So all these times he's told, "Geez, your guns are being recovered at crime scenes. This is dangerous. You've got to stop," over and over and over again. So I lack Mr. Moyers's certainty that -- without some specific deterrence by putting Mr. Caldwell in custody, I lack Mr. Moyers' certainty.

General deterrence, and this is my last point. Mr. Moyers says, and I think he's right, I think he's mostly right, that

1    people who are visited by an ATF agent and given one of these

2    warning letters are a deterrable population, that those people

3    should get with the program or not get off.  Frankly, I think

4    there's a general deterrent message still that, not because

5    people will read things in the newspaper or see it on TV, but

6    next time an ATF agent delivers one of those warning letters, I

7    want them also to be able to be in the position to deliver a

8    story.  "Look what happened to Thomas Caldwell.  I want you to

9    understand that this can cause you to go to prison, so you have

10   to stop.  Either stop or you fill out this form that I'm handing

11   you and become a licensed FFL."

12         So those are my three points.  I appreciate the time.

13         THE COURT:  Thank you, Mr. O'Shea.

14   Mr. Moyers.

15         MR. MOYERS:  Yes.  I too am going to talk about three

16   things here.  The first is what I'll call moral luck.  I brought

17   this up in my sentencing memo, but I want to amplify it here,

18   which is, of course, of course, Mr. Caldwell feels terrible

19   about how he was selling firearms and how they ended up hurting

20   people, people that he considers to be on his team.  He's got a

21   military background, family's big in military, family member is

22   a corrections officer, but I would never think of coming in here

23   and saying "Mr. Caldwell's guns were never involved in any

24   crime," to come in here and say, "Well, that should mitigate his

25   sentence.  That should mitigate his sentence because it was

1  never -- no gun was ever found in any crime scene, ever hurt

2  anybody," and I can hear my friend, Mr. O'Shea, saying in that

3  hypothetical case, "Your Honor, it hasn't hurt anybody yet.  It

4  hasn't hurt anybody yet," and so the point here is that if it

5  can't mitigate, it certainly shouldn't aggravate.

6  THE COURT:  I'm persuaded by that.  I understand the

7  concept of moral luck.  I get it, and I don't think anybody here

8  expects me to treat Mr. Caldwell as though he murdered Commander

9  Bauer.

10  MR. MOYERS:  Sure.

11  THE COURT:  What it is is a vivid demonstration of the

12  catastrophic risk of Mr. Caldwell's conduct, and so it takes the

13  risk from an abstraction to a very vivid and moving story.

14  MR. MOYERS:  Yes.

15  THE COURT:  But, again, he's not the shooter.  I

16  understand your point.  It does illustrate the scope of the

17  risk, and that is what's important here.  It isn't as though Mr.

18  Caldwell committed some minor infraction that doesn't pose a

19  substantial risk and through some freakish occurrence happened

20  to cause some devastating injury or loss of life.  This is the

21  very risk that is meant to be redressed by the law prohibiting

22  what Mr. Caldwell did.  And so, yes, I understand the concept of

23  moral luck.  He's not the murderer, but he contributed in a very

24  substantial way to the risk the crime was meant to redress, and

25  so that's how I'll understand it.  You know, he's not a

1    murderer.

2         MR. MOYERS:  Well, then I'll move on to my second point

3    here, which is Mr. Caldwell is very different than the

4    underground drug -- or underground gun trafficker.  The numbers

5    are right.  He was obstinate in selling them, but as paragraph

6    20 of the PSR points out, when the agents visited him -- I

7    believe this would be the visit in February of 2018 -- the PSR

8    says, "The defendant showed agents at least eight different

9    ledgers documenting his firearm sales.  The ledgers contained

10   the details of his firearm sales, including the identifying

11   information for each firearm, the price of the firearm sale,

12   price for the FFL transfer, and shipping costs."

13        The point I'm making here is I've never had a client who

14   has kept such detailed ledgers, so the point here is he's at

15   least trying to organize and keep track of his sales.  I mean,

16   he's keeping track of the price for the FFL transfer.  This is

17   not someone who is -- has come entirely off the rails and is

18   just determined to hide criminal behavior, so I would caution

19   the Court to -- caution the Court about calling -- or describing

20   him as someone who was just entirely reckless and thoughtless.

21        Now, this gets -- I guess we'll call this my third point,

22   but it is related, is that Mr. Caldwell didn't get the message

23   about this for a long time.  Obviously he got visited by the ATF

24   agents several times.  They brought him a letter.  They even

25   brought him an application, but then after the search warrant,

if you go to paragraph, I believe, 24 of the PSR, April 2nd the
defendant makes an unsolicited call to ATF agents.  He has no
idea how much trouble he's in.  He's just had the ATF raid his
home, take a bunch of firearms, and what he does is he calls up
the -- calls ATF agents, and "He wanted to know when his
firearms would be returned to him.  He suggested law enforcement
investigate Kevin Sweepee for selling firearms.  The defendant
felt bad he sold the firearm to Sweepee that was used to murder
the police commander."

This is somebody who still doesn't understand and doesn't
have a grasp yet.  It's not coming from some venal place where
he doesn't -- he's just flouting the law that he knows well.  He
doesn't understand how much trouble he's in.  He doesn't get yet
what's happened and how serious this is.  Now, this obstinacy,
it goes away.  Once he's charged, he grumbles a little bit about
it around the plea, but then since then he's expressed remorse
to friends and family members.  He gets it.  The firearms were
taken out of his home.  He feels it's a relief because those are
portable, expensive items.  He was always afraid he was going to
get burgled.  He talks about it being a weight off, and that
matters.

And what I don't want to get lost in all this is Mr.
Caldwell will be 69 in January.  He can't have a ton of years
left, and this will be the bulk of his legacy.  If you Google
his name, it will forever be associated with this, and so I

1    would like to take this time just to highlight his military

2    service, his long battle with mental illness, and then also I

3    want to point out -- I'd like to read from two letters that I

4    just received --

5             THE COURT:  These are two new ones?

6             MR. MOYERS:  Yes.

7             THE COURT:  Okay.

8             MR. MOYERS:  This one is from Nancy Kristiansen, who

9    worked at, I guess, Skaalen Nursing and Rehab Center in

10   Stoughton.  It's in paragraph 126 of the PSR.  She writes, "He

11   has a gift for working with the elderly, particularly those with

12   Alzheimer's and related dementias.  Tom is patient, kind, and

13   dependable.  I would trust him to care for my own elderly and

14   disabled family members."

15       And the second one I'd like to read, this is from Janet

16   Lathrop, who is a cousin of Mr. Caldwell's.  "Just in September

17   at my mother's funeral luncheon, her two elderly neighbors were

18   there.  They both use a cane and a walker.  Tom assisted them to

19   the food table, helped them fix their plates, and helped them

20   get seated, making sure they were safe and other people could

21   get around their ambulation equipment.  He didn't know them.

22   That is just his way.  I did get a few minutes to talk to Tom

23   that day, and he was with his brother.  Tom looked very worried.

24   He gave me a very tight squeeze as they were leaving.  He told

25   me he had made poor choices and was sorry for it."

1    Tom would like to be remembered that way, for the good

2    things he's done, for his life of complying with the law, for

3    even being on the side of law enforcement.  And now this, to

4    come in here and to hear just heartbreaking impact statements,

5    to read in the paper about how terrible this whole course of

6    events was, it's humiliating and sends him a message that a

7    letter from an ATF agent wasn't going to do, even a search

8    warrant taking all the guns from your house.  Those are

9    instances.  Those are discrete.  They're episodic.  The digital

10   legacy and knowing that everybody knows that knows him, that's

11   shame that will punish him forever.

12   And at the end of the day, what we have here is a

13   68-year-old man who's not in terribly good physical health;

14   takes, I guess, almost a dozen medications; has schizoaffective

15   disorder, which is imperfectly managed with medication; receives

16   disability; helps out with the elderly and disabled; is by all

17   accounts a productive and wonderful man that you would want as a

18   neighbor in your community.  And this is not the type of person

19   that should be punished with prison, and this episode has

20   punished him enough in an otherwise very admirable life, and it

21   will continue to punish him until he passes away.  I'll leave it

22   at that.

23   THE COURT:  All right.  Thank you, Mr. Moyers.

24   All right.  Mr. Caldwell, you've got the right to address

25   the Court before I decide your sentence.  You don't have an

obligation to say anything, but if you have anything to add, I would very much like to hear it. Mr. Caldwell, pull the microphone over a little bit, if you wouldn't mind.

THE DEFENDANT: I have nothing to add, sir.

THE COURT: Nothing? All right. Okay. Very good.

I'm going to take a brief recess, and then we'll come back and finish up.

THE CLERK: All rise. This Honorable Court stands in recess.

(Recess at 11:42 a.m. until 11:47 a.m.)

THE COURT: When I was a young guy, we lived in northern Wisconsin, and we all hunted. It was, I think, fairly described as a gun culture. Everybody that I knew had guns. We had a handloading station in our basement. But the one thing that was drilled into me beyond any doubt is that if you're going to use guns or be around guns, you have to respect the awesome power that a firearm presents. I can't tell you how much time we spent being drilled on that, that having a gun was an awesome, awesome responsibility, and mistakes were catastrophic. So Mr. Caldwell could have lived the rest of his life revelling in gun culture and having all the guns that he wanted that he could legally have, and really all he had to do was get a license to buy and sell them to make sure that he wasn't selling them to people who were going to use them illegally.

His behavior here is incredibly insistent.  I mean, I really can't understand how, once you got the letter from the ATF, that you could continue to sell guns without a license, and, in fact, they practically just invited you just to get the license.  I can only conclude that it goes way beyond laziness that you didn't fill out the application and become a licensed dealer.  I think you just didn't care who you sold the guns to. I just -- I can't imagine that it was just a lack of interest in doing that paperwork.

And your behavior was particularly knowing because at times you took steps to avoid detection and to avoid being reported, so even before you got the letter when you were purchasing guns, you knew enough to structure the purchase that you didn't buy more guns than would trigger a reporting obligation from the people that you were buying from, and, of course, the time line that Mr. O'Shea goes over after you were notified that you shouldn't sell guns without a license, that, in fact, the guns you sold were being delivered to people who were not authorized to have them, and then ultimately the thing that I just can't understand is after you found out that one of the guns you sold was used to murder Commander Bauer, then you still kept doing it after that.

So you are not Captain -- Commander Bauer's murderer, but the risk was -- not only should be apparent to anybody, it was particularly pointed out to you that what you were doing was a

danger to the community.  I am not at all persuaded that the

charge and the shame that you appropriately feel now and should

feel for the rest of your life is going to be enough to deter

you given your insistent pattern before, so I am not persuaded

that you do not represent an ongoing risk to the public.

Your mental illness does not explain your conduct.  I see

nothing in the record here that suggests that you really were as

clueless as Mr. Moyers presents.  I have the letter from your

psychologist -- your psychiatrist that says that your mental

illness is well controlled with your medications.  I see no

indication that you haven't taken the medication, and so I

appreciate the fact that you have struggled with mental illness,

but I don't see anything in here in this record that really

attributes your conduct to that mental illness.  Your conduct

really is very insistent and, as I said, very knowing all along,

so I don't think the mental illness really offers an

explanation.

I'm not persuaded by Mr. Moyers' argument that the

guidelines overstate the risk that your criminal conduct

proposes.  The 1987 version of the guidelines would have been

more lenient.  They're not the ones that are currently

applicable, and I think that over the course of the decades, we

have recognized the epidemic of gun violence suggests that the

punishment should be more severe than were recommended in

previous version of the guidelines, so I'm not persuaded by

1    that.

2         I appreciate the fact that you do have many aspects of a

3    good character.  You're a kind-hearted person.  You're not a

4    sociopath.  I also appreciate the fact that you're not the most

5    mercenary gun dealer that we might -- that we might find, but

6    you have so effectively compartmentalized your illegal activity

7    from the other kindnesses you extend to the people in your life

8    that I just can't ignore it, and it doesn't excuse it.  You're

9    not a relentlessly evil person.  I'm not suggesting that.  But

10   in this aspect of your life, you have so blinded yourself to the

11   illegality and to the danger of your activity that I think it

12   warrants a stern sentence for all of the purposes that Mr.

13   O'Shea outlined, to reflect the seriousness of your crime, to

14   provide specific deterrence to you, and to protect the public

15   from your gun dealing, at least over the period of your

16   incarceration and hopefully during your supervised release.

17        I don't know about the general deterrent effect of my

18   sentence.  I often think that, you know, people who are going to

19   commit crimes aren't really paying attention to what goes on in

20   federal court, but I do think Mr. O'Shea makes a good point:

21   Your story should be on object lesson for anybody who thinks

22   that they can sell such a large volume of guns off the record to

23   people who may be doing who knows what with them.  The Caldwell

24   story will resonate with them.

25        I will make a concession to your age and to your physical

condition by sentencing you at the low end of the guidelines.

68 on to 69 does not strike me as an extremely elderly person,

but you do have substantial physical impairments, and so I will

reflect the fact -- the guidelines don't take into consideration

your age and your physical condition, but I think it's an

appropriate consideration when I think what is an appropriate

punishment for you, but I think it would be appropriate to

consider that as something that would move you to the bottom of

the guidelines rather than being at the high end of the

guidelines because rarely have I had an offender who was so

insistent on continuing to violate the law after receiving so

many clear-cut warnings.  I mean, most people would back off at

some point.

So the sentence that I will impose will be the 37 months at

the bottom of the guideline range.  I think the crime itself

would warrant more substantial punishment, but as I said, as a

concession to your age and to your physical impairments, I will

sentence you to the 37 months.

That will be followed by three years of supervised release.

That is the maximum term that I can impose.  Given your

insistent behavior, the maximum term of supervised release is

appropriate to make sure that you haven't returned to any

activities involving firearms.

I didn't get any objections to the conditions of supervised

release, so I'm prepared to impose those that are recommended in

1    the presentence report, but I'll give Mr. Moyers a last chance

2    to speak up about whether he has any concerns with those

3    conditions.

4          MR. MOYERS:  We do not.

5          THE COURT:  All right.  And would you like me to read

6    those on the record?

7          MR. MOYERS:  No.  It's more fruitful if I go over them

8    in person with Mr. Caldwell.

9          THE COURT:  All right.  So in light of the waiver of

10   the requirement that I read the conditions, I won't read them

11   in.  Do you need any further justification for any of those

12   conditions?

13         MR. MOYERS:  No, they're all justified.

14         THE COURT:  All right.  Very good.  So, Mr. Caldwell, I

15   will impose conditions 2 through 5, 8 and 9.  Those are among

16   the standard conditions of supervision in this district.  And

17   I'll impose special conditions 12 through 15.  They're all

18   justified in the report.  I won't read them here.  It's tedious

19   for me to read them to you.  It's better to look at them in

20   writing when you've got somebody to go over them with anyway.

21   You'll have to sign and acknowledge them, so please do that.

22   Look at them carefully because they will be enforced.

23         Now, I will also say this, that those conditions can be

24   changed.  So if during your supervision or when your supervision

25   begins you need those conditions to be adjusted, make a motion

1    to the Court. We can consider that. The government or the

2    probation office can do the same thing. So the conditions are

3    not unchangeable.

4        All right. This offense is not drug related, but the

5    defendant does have a lengthy and documented history of some

6    drug and alcohol abuse, although I believe it's well managed

7    now, but because of that history, I will not waive the mandatory

8    drug testing requirement that's in Title 18, United States Code,

9    Section 3563(a)(5). The defendant shall be subject to the

10   statutory requirement of three drug tests while on supervision.

11       It is adjudged that the defendant is to pay a $100 criminal

12   assessment penalty to the Clerk of Court for the Western

13   District of Wisconsin immediately following sentencing.

14       I do find that the defendant does not have the means to pay

15   a fine under the principles that are in guideline Section

16   5E1.2(c) without impairing his ability to support himself upon

17   release from custody, so I impose no fine.

18       The probation office is to notify local law enforcement

19   agencies and the state attorney general of the defendant's

20   release to the community.

21       And let's hear about detention status. I'm inclined to

22   allow Mr. Caldwell to self-report, but let's find out if the

23   government objects to that.

24       MR. O'SHEA: I think that would be best, Your Honor,

25   because that way Mr. Moyers can work with the folks in probation

1   and parole to make sure that BOP understands Mr. Caldwell's

2   medical needs, has a list of all his medications, and they can

3   get things set before Mr. Caldwell enters.

4           THE COURT:  All right.  Very good.  I agree with that.

5   Accordingly, the execution of the sentence of imprisonment will

6   be stayed until December 6th, 2018, between the hours of noon

7   and 2:00 p.m. when the defendant will report to an institution

8   that I will designate by further court order.  The present

9   release conditions will be continued until the defendant begins

10  his sentence of imprisonment.

11      I don't believe there's any restriction on the right to

12  appeal; is that correct, Mr. O'Shea?

13          MR. O'SHEA:  I apologize.  I don't have the letter

14  here.

15          MR. MOYERS:  It doesn't -- no, it doesn't look like it,

16  other than in the event of an appeal by either party, the United

17  States reserves the right to make arguments in support of or in

18  opposition to the sentence imposed --

19          THE COURT:  Yes.  There's no restriction on the right

20  to appeal.  Usually I make a note of that.

21      All right.  Mr. Caldwell, you have the right to appeal your

22  conviction if you think your plea was somehow unlawful or

23  involuntary.  You've got the right to appeal the sentence I just

24  imposed if you think the sentence is contrary to law.  If you

25  want to appeal, you must file a notice of appeal within 14 days

1    of entry of judgment or within 14 days of any notice of appeal

2    that would be filed by the government if they were to appeal.

3        If you can't afford the filing fee for the appeal, you can

4    apply for leave to appeal *in forma pauperis*, which means without

5    paying the filing fee, and if you can't afford an attorney to

6    represent you in the appeal, you can apply for court-appointed

7    counsel that would be at government expense if that were

8    necessary.

9        Let's find out if there's anything else we need to address

10   today.  Mr. O'Shea?

11       MR. O'SHEA:  That was the last thing on my list, Your

12   Honor.  Thank you.

13       THE COURT:  All right.  Very good.  Mr. Moyers,

14   anything else?

15       MR. MOYERS:  No.  We got it all.

16       THE COURT:  Okay.  And, Ms. Cwirla, anything else from

17   the probation office side?

18       AGENT CWIRLA:  No, Your Honor.

19       THE COURT:  Okay.  Very good.  And I hope that the

20   friends, family, and colleagues of Commander Bauer can get more

21   profound justice in the prosecution of the person who murdered

22   your friend and colleague.

23       Thank you, all.

24       THE CLERK:  This court stands in recess.

25       (Proceedings concluded at 12:00 p.m.)

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that the

3    foregoing is a true and accurate record of the proceedings held

4    on the 1st day of November, 2018, before the Honorable

5    James D. Peterson, Chief U.S. District Judge for the Western

6    District of Wisconsin, in my presence and reduced to writing in

7    accordance with my stenographic notes made at said time and

8    place.

9          Dated this 15th day of November, 2018.

10

11

12

13

14

15                          /s/ Jennifer L. Dobbratz

16                     Jennifer L. Dobbratz, RMR, CRR, CRC
                            Federal Court Reporter
17

18

19

20

21

22

23

24   The foregoing certification of this transcript does not apply to
     any reproduction of the same by any means unless under the
25   direct control and/or direction of the certifying reporter.